IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JAMES NATHANIEL WATTS,<br><br>    Defendant. | Case No. 14-cr-40063-JPG |

### MEMORANDUM AND ORDER

This matter comes before the Court on defendant James Nathaniel Watts' motion for discovery of information concerning the United States Department of Justice's ("DOJ") operation of the federal death penalty (Doc. 129). The Government has responded to the motion (Doc. 191), and Watts has replied to that response (Doc. 209).

**I.   Background**

Watts has been charged in a two-count Indictment (Doc. 15). Count 1 charges Watts with the May 15, 2014, attempted armed bank robbery of the First National Bank in Cairo, Illinois, in violation of 18 U.S.C. § 2113(a), (d) and (e). The indictment further alleges that in attempting to rob the bank, Watts used dangerous weapons to assault or put in jeopardy the life of another person and, in fact, killed Anita Grace and Nita Smith. Because the indictment alleges that death resulted from the attempted bank robbery, the possible penalties should Watts be convicted are death or life imprisonment. *See* 18 U.S.C. § 2113(e). Count 2 charges Watts with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The DOJ has authorized the United States Attorney for the Southern District of Illinois to pursue the death penalty in this case, and accordingly, the Government has filed a Notice of Intent to Seek the Death Penalty pursuant to 18 U.S.C. § 3593(a) (Doc. 92).

Watts believes the Government's decision to authorize pursuit of the death penalty in this case is infected with race and/or gender bias; Watts is an African-American man, and Anita Grace and Nita Smith were both white women.   Specifically, he asserts that defendants who kill white female victims, especially African-American men who kill white women, receive the death penalty at a substantially higher rate than those who kill others.   He argues the disparity is so high it cannot be due to mere chance.   Therefore, Watts believes imposition of the death penalty would be arbitrary because it would rest, at least in part, on factors such as race or gender that are irrelevant and improper.   In order to gather information to prove this theory, Watts asks the Court to allow discovery concerning his bias claim.   Specifically, he seeks

(1) All demographic information concerning potential capital cases, collected and considered by the DOJ, collected pursuant to the June 6, 2002, DOJ memoranda; and

(2) Any internal studies, reports, memoranda or other documents detailing the effect of race or gender, including the race and gender of both the defendant and victims in application of the federal death penalty.

The Government argues that Watts has not made the demanding threshold showing of discrimination required for discovery established by *United States v. Armstrong*, 517 U.S. 456 (1996), and applied in *United States v. Bass*, 536 U.S. 862 (2002) (*per curiam*).   The Government argues that statistical evidence that a prosecution policy has a disparate impact on a particular group, without evidence that individuals similarly situated to a defendant were actually treated differently, is insufficient to make the required showing.   It notes that Watts has not pointed to any white men similarly situated to him in background and alleged criminal acts for whom the relevant decision-makers did not seek the death penalty.   Nor has he pointed to evidence of any discriminatory intent existing in the Government's procedures used to determine whether to pursue the death penalty against a defendant – the DOJ's Death Penalty Protocol.   In fact, the

Government notes that, in most cases, at the final steps of the Protocol, the decision-makers are not aware of the race of the defendants or the victims. Specifically with respect to Watts' requests for internal DOJ documents, the Government asserts such materials are privileged under the deliberative process privilege, attorney-client privilege and/or the work-product doctrine.

In reply, Watts argues that the threshold showing necessary to obtain discovery does not require an example of a white man in exactly the same situation as Watts who had not been prosecuted for the death penalty. Watts argues that in light of the statistics showing a disparate impact where a white woman is killed, it is enough to show he was charged for killing two white women where African-Americans who killed other African Americans were not. He further argues that the fact the DOJ collects information about race and gender in connection with the death penalty to monitor whether it is implemented in an unbiased way is reason enough to require disclosure of that information and removes such information from deliberative process privilege territory. Furthermore, he argues, he seeks only statistics, not decisional information that may be shielded by the deliberative process privilege. Watts also argues the Government has not properly or adequately asserted the attorney-client privilege, which must be asserted by the Attorney General herself after personally reviewing the purportedly privileged materials. Finally, Watts asserts that the Government is not entitled to a privilege to shield documents that reflect race-biased decisionmaking.

**II.     Analysis**

As a preliminary matter, the Court ordered the Government to respond to a suggestion in Watts' reply brief that the President had recently ordered the DOJ to provide certain information regarding racial bias in the operation of the federal death penalty and that such a request would call

for disclosure of the information sought in this motion (Doc. 220).   The Government responded that the President has not requested production of information regarding racial bias *to criminal defendants* but rather has requested the DOJ and the White House Counsel's Office provide *him* with certain information, including information about death penalty cases, in connection with general criminal justice reform efforts (Doc. 232).   Thus, it appears the DOJ will not produce the information to Watts voluntarily.

### A. Legal Framework

The Court turns to the question of the appropriate standard for discovery when a defendant claims selective prosecution based on race.   In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court held that in order to be entitled to discovery on a claim that a defendant was prosecuted based on race, the defendant must "show that the Government declined to prosecute similarly situated suspects of other races."   *Id.* at 458.   In *Armstrong*, two defendants were charged in federal court with crack cocaine offenses.   *Id.* at 458-59.   They sought discovery and dismissal of the indictment on the basis that they were selectively prosecuted because they were African-American.   *Id.* at 459.   In support of their arguments, they submitted evidence that in all of the 24 drug conspiracy cases closed in 1991 by the Federal Public Defender's Office in the district, the defendants were African-American; that there were as many Caucasian drug users and dealers as there were minority users and dealers in the community; that many non-African-American crack cocaine offenders were prosecuted in state rather than federal court; and that crack cocaine offenders, nearly all of whom were African-American, were punished more severely than powder cocaine offenders.   *Id.* at 459, 460-61.

In examining the defendants' request for discovery, the *Armstrong* Court noted that the

standard for proving selective prosecution is demanding and that there is a "'background presumption' that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463-64 (internal citation omitted). This is because a selective prosecution claim asks the Judicial Branch to exercise power over – and possibly impair the performance of – the Executive Branch, which is vested with broad discretion to enforce federal laws and which is more competent to evaluate legitimate factors that go into deciding whether to prosecute a case. *Id.* at 464, 465. Consequently, courts should presume prosecutors have properly discharged their official duties unless there is " clear evidence to the contrary." *Id*. at 464. So long as a prosecutor has probable cause to believe a defendant committed a crime, he or she has discretion whether to prosecute and which crime to charge, subject only to constitutional restraints, *e.g.*, he or she cannot base the decision on an impermissible factor such as race or gender. *Id.*

To prove a selective prosecution claim, the defendant must "demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Consistent with ordinary equal protection principles, "[t]o establish a discriminatory effect in a race case, the claimant must show that *similarly situated individuals of a different race were not prosecuted*." *Armstrong*, 517 U.S. at 465 (emphasis added) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding selective treatment where law was applied against Chinese nationals but not against non-Chinese people in the same situation); *Ah Sin v. Wittman*, 198 U.S. 500, 507-08 (1905) (rejecting selective prosecution claim where Chinese defendant did not show non-Chinese offenders were not prosecuted)). To establish discriminatory purpose, the defendant must show

5

the Government "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (internal quotations omitted); *accord Wayte*, 470 U.S. at 610; *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001).

The *Armstrong* Court further held that because discovery for a selective prosecution claim is burdensome to the Government and may disclose its prosecution strategy, the standard is rigorous.  *Armstrong*, 517 U.S.. at 468.  The Court therefore held that to obtain discovery a defendant must make "a credible showing of different treatment of similarly situated persons," a standard which "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."  *Id.* at 470.  The Supreme Court thought this burden would not be insuperable if the claim of selective prosecution was well-founded.  *Id.*

The *Armstrong* Court concluded that the admissible evidence offered by the defendants in that case was insufficient to merit discovery because it did not "identify individuals who were not black and could have been prosecuted for the offenses for which [defendants] were charged, but were not so prosecuted."  *Id.*

In *United States v. Bass*, 536 U.S. 862 (2002) (*per curiam*), the Supreme Court reaffirmed the rule that a defendant seeking discovery on a selective prosecution claim "must show some evidence of both discriminatory effect and discriminatory intent."  *Id.* at 863.  In *Bass*, the defendant attempted to make the required "credible showing" that "similarly situated individuals of a different race were not prosecuted" for the death penalty by presenting national statistics showing that African-Americans were charged with death eligible offenses more than twice as often as whites and that the Government entered into plea bargains more frequently with whites

than African-Americans.  *Id.* at 863.  The Court noted that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants." Id.* at 864 (emphasis in original).  The Court concluded that since the defendant had "failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery."  *Id.*

    B.    <u>Application</u>

To determine whether Watts has made the required showing, the Court first looks at what showing he must make based on the discrimination alleged.  *Armstrong* makes clear that to support his claim that he was prosecuted at least in part because of his race, he must make a credible showing that other similarly situated non-African-Americans were not prosecuted.  The question must be tweaked a bit for his other race discrimination claim, that the Government is seeking the death penalty at least in part because the victims were white.  In that context, he must show that similarly situated defendants whose victims were not white were not prosecuted.  *See Belmontes v. Brown*, 414 F.3d 1094, 1127 n. 12 (9th Cir. 2005), *rev'd on other grounds sub nom Ayers v. Belmontes*, 549 U.S. 7 (2006); *see, e.g., McCleskey v. Kemp*, 481 U.S. 279, 292-97 (1987) (purposeful discrimination not demonstrated by statistics showing people who murder whites more likely to be sentenced to death than those who murder African-Americans).

In support of his request for discovery, Watts points to law review articles and studies citing statistics showing that African-Americans and other minorities are overrepresented on death rows, including federal death row, compared to their representation in the general population; that defendants across the country are more likely to be sentenced to death for killing a white victim, especially a white woman, than for an African-American victim; and that African-Americans are

executed disproportionately compared to their representation in the general population. Watts also offers the declaration of Lauren Cohen Bell, Ph.D., an associate professor of political science and associate dean of the college of Randolph-Macon College, testifying that defendants who kill white women victims receive the death penalty at a substantially higher rate than other defendants who kill victims who were not white women.

Watts also points to five examples of men for whom the Government has not sought or secured the death penalty:

- James P. Perry, a white man who killed a white man and was sentenced to serve 276 months in prison;

- Alexis Terreforte Quidgley, a Hispanic man convicted of armed bank robbery that resulted in the killing of a Hispanic man and was sentenced to serve 352 months in prison;

- Yohann Nelson, an African-American man who killed an African-American man and was sentenced to serve 117 months in prison;

- Derrick Davis, an African-American man convicted of armed bank robbery that resulted in the killing of an African-American man; and

- Leonard Jerome Holiday, an African-American man who, with three other African-American men, was convicted of killing an African-American woman.

He further points to one example where the death penalty was prosecuted:

- Odell Corley, an African American defendant convicted of bank robbery that resulted in the killing of a white woman and sentenced to death.

The evidence tendered by Watts does not amount to a credible showing that similarly situated individuals in a different category were not prosecuted for the death penalty. The statistics Watts cites are the kind of statistics rejected in *United States v. Bass*, 536 U.S. 862 (2002) (*per curiam*), as a basis for ordering discovery and, indeed, they do not show Watts received disparate treatment by those responsible for deciding to pursue the death penalty in this case.

Watts argues that *Belmontes v. Brown* leaves room for such statistics to make the required showing when they are specific to the relevant decision-maker rather than drawn from broad statewide or nationwide sources. *Belmontes v. Brown*, 414 F.3d at 1127 (statistics regarding one county's prosecution decisions sufficient to prove discriminatory effect in that county); *see United States v. Barlow*, 310 F.3d 1007, 1011 (7th Cir. 2002) (relevant and reliable statistics can establish discriminatory effect under the *Armstrong* test). Nevertheless, they do not do so in this case. As noted above, *Bass* rejected the use of raw statistics regarding overall charges as probative of the charges brought against a particular defendant and those similarly situated to him.[1] Similarly, Dr. Bell's statistics speak to the outcomes of death penalty prosecutions – who *receives* the death penalty – in cases where myriad undisclosed legitimate prosecutorial factors as well as the jury's consideration of individual aggravating and mitigating factors result in an individualized sentencing determination. This sheds little light on the impact of race or gender on the Government's decision to pursue the death penalty.

The Court now turns to the specific defendants Watts believes are similarly situated to him but were not prosecuted for or did not receive the death penalty. As a preliminary matter, it is

---

[1] An analysis of the decisions regarding the pursuit of the death penalty in this judicial district might have been more relevant to the treatment Watts received. However, to the best of the Court's knowledge, within the past 20 years, other than Watts, the Government has decided to pursue the death penalty against two white males and an African-American male for killing a white female (*United States v. Abeln, Westmoreland & Lewis*, 98-30022-WDS) and three white males for killing an African-American male (*United States v. Sahakian, Knorr and McIntosh*, 99-cr-40044-JPG). The notices of intent to pursue the death penalty were withdrawn for Abeln, Westmoreland and Lewis, and each of those defendants was sentenced to life in prison. Sahakian, Knorr and McIntosh were tried to a hung jury and their cases were dismissed without prejudice. The Government declined to pursue the death penalty for death eligible crimes prosecuted against one Native American male for killing a Native American male (*United States v. White Feather*, 11-cr-40060-JPG) and one white male for killing a white male (*United States v. Folts*, 12-cr-40015-JPG). Even in the absence of details about the circumstances of these other defendants, the foregoing facts suggest it would be difficult to make a showing that the decision-makers in this district have discriminated on the basis of race or gender.

Watts' burden to show those defendants are similarly situated. To be similarly situated for the purposes of selective prosecution analysis, defendants must be similar in all legitimate factors relevant to the decision to prosecute. *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). The list of factors includes such things as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985). They also include relative culpability, willingness to cooperate with the Government,

> the strength of the evidence against a particular defendant, the defendant's role in the crime, whether the defendant is being prosecuted by state authorities, the defendant's candor and willingness to plead guilty, the amount of resources required to convict a defendant, the extent of prosecutorial resources, the potential impact of a prosecution on related investigations and prosecutions, and prosecutorial priorities for addressing specific types of illegal conduct.

*Olvis*, 97 F.3d at 744. The comparable defendants need not, as the Government suggests, be identical in all factors, but they need to be similar enough that "their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Id.* This allows the inference that the decision to prosecute – or how to prosecute – is based on an impermissible factor rather than legitimate ones. *See id.*

With respect to the people Watts claims are similarly situated to him, Watts has described nothing but the race and gender of the defendants and victims and the general nature of the crimes charged ("bank robbery/armored car murder"). He has not described any of the host of other legitimate prosecutorial considerations that could justify making different prosecution decisions. Just as one example, it appears from Watts' descriptions that none of the defendants cited were charged with killing two victims, as Watts is. The number of victims certainly could be a legitimate reason for seeking the death penalty against one defendant but not another. Without a

showing that these other defendants are at least similar to Watts in other respects as well as race, gender and crime charged, Watts has not carried his burden of making a credible showing that he has been prosecuted for the death penalty where a similarly situated individual of a different race, or a similarly situated individual with a victim of a different race or gender, has not.

Turning to the question of discriminatory intent of the decision-makers in this case, Watts has not made any credible showing that they were motivated, at least in part, by Watts' race or by the victims' gender or race.   The Government, on the other hand, has described its decision-making process in the Death Penalty Protocol, United States Attorneys' Manual, tit. 9, § 10, which sets forth race- and gender-neutral standards for approving the pursuit of the death penalty.   Watts has made no showing that implementation of the Protocol is infected by intentional race or gender bias.

Because Watts has failed to make a credible showing of discriminatory effect or discriminatory intent in the way the Government decided to pursue the death penalty against him, he is not entitled to discovery on the matter.   In light of this ruling, the Court need not address the Government's privilege claims.

### III.     Conclusion

For the foregoing reasons, the Court **DENIES** Watts' motion for discovery of information concerning the DOJ operation of the federal death penalty (Doc. 129).

**IT IS SO ORDERED.**
**DATED:   January 25, 2016**

                                                  s/ J. Phil Gilbert
                                                  **J. PHIL GILBERT**
                                                  **UNITED STATES DISTRICT JUDGE**