IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 14-cr-40063-JPG |
| JAMES NATHANIEL WATTS, | |
| Defendant. | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant James Nathaniel Watts's motion to strike the petit jury venire based upon systematic discrimination against African-Americans (Doc. 362). The Government has responded to the motion (Doc. 385).

**I.      Background**

Watts has been charged in this case in a two-count Indictment (Doc. 15).   Count 1 charges Watts with the May 15, 2014, attempted armed bank robbery of the First National Bank in Cairo, Illinois, in violation of 18 U.S.C. § 2113(a), (d) and (e).   The indictment further alleges that in attempting to rob the bank Watts used dangerous weapons to assault or put in jeopardy the life of another person and, in fact, killed Anita Grace and Nita Smith.   Count 2 charges Watts with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).   Because the indictment alleges that death resulted from the attempted bank robbery, the possible penalty should Watts be convicted of Count 1 is death or life imprisonment.   *See* 18 U.S.C. § 2113(e).   The Government seeks the death penalty under the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-98, and accordingly, pursuant to § 3593(a), has filed a Notice of Intent to Seek the Death Penalty (Doc. 92).

Watts's case is set to be tried in June 2017 at the courthouse in Benton, Illinois.   The petit

jury selection process began with the Benton Master Jury Wheel that was filled in April 2015 according to the Court's Plan for the Random Selection of Jurors (Revised November 2011) ("2011 Jury Plan"). Under that plan, individuals comprising the Benton Master Jury Wheel were randomly selected from general election voter registration lists and lists of licensed drivers eighteen years or older ("source lists") covering twenty-seven counties in the Southern District of Illinois (the "Benton Division"). 2011 Jury Plan at 2-4. In April 2015, 9,685 individuals were randomly selected from those source lists to fill the 2015 Benton Master Jury Wheel.[1]  *See* Report on Operation of the Jury Selection Plan ("AO-12") for Benton Master Jury Wheel Filled 4/27/2015, pt. I (Doc. 362-2).

The petit jury selection process in Watts's case will continue according to the Plan for the Random Selection of Jurors (Revised September 2015) ("2015 Jury Plan"). Under that plan, juror qualification questionnaires will be sent to randomly selected individuals drawn from the 2015 Benton Master Jury Wheel. 2015 Jury Plan at 4-5. Based on an individual's responses in the questionnaire, he or she will either be deemed unqualified for service, exempt from service, excused from service upon request, or qualified. 2015 Jury Plan at 5-6. Those deemed qualified will be placed in the Benton Qualified Jury Wheel for this case and may be sent a case-specific juror questionnaire and/or summoned to Court for voir dire and final jury selection. 2015 Jury Plan at 7.

To monitor the operation of the Court's jury selection plans, the Court's jury administrator periodically completes a Report on Operation of the Jury Selection Plan, the AO-12. The AO-12 completed on November 6, 2015, for the 2015 Benton Master Jury Wheel analyzes the

---

[1] 10,082 individuals were originally randomly selected, but after removal of deceased individuals or individuals who had moved out of the district, 9,685 individuals remained.

demographics of the jurors that were actually qualified as jurors (that is, who returned juror qualification questionnaires and who were not deemed unqualified, exempt or excused) since the inception of the 2015 Benton Master Jury Wheel.  As of November 6, 2015, 703 individuals from the 2015 Benton Master Jury Wheel had been qualified.  AO-12 for Benton Master Jury Wheel Filled 4/27/2015, pt. III (Doc. 362-2).  Of those 703 individuals, 16 reported that they were Black or African-American, which was 2.28% of the qualified jurors from the 2015 Benton Master Jury Wheel.  *Id.*  At that time of the 2010 United States Census, Black or African-American individuals made up 5.3% of population 18 years old or older in the Benton Division.  AO-12 for Benton Master Jury Wheel Filled 4/27/2015, pt. IV (Doc. 362-2).  These percentages are consistent with the AO-12 for the Benton Master Jury Wheel Filled 6/10/2013, pt. III & IV (Doc. 362-1), which shows 2.51% of the qualified jurors from that wheel were Black or African-American.

Watts asks the Court to strike the petit jury venire in this case – that is, those that will be selected to answer the case-specific jury questionnaire and/or summoned to the Court for voir dire and final jury selection – on the grounds that African-Americans have been systematically excluded from that group in violation of the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861 *et seq.* and the U.S. Constitution.  The Government contends that African-Americans are not underrepresented and, if they were, the underrepresentation is not a product of systematic exclusion.

## II.     Analysis

Criminal defendants are entitled to be "tried by an impartial jury drawn from sources reflecting a fair cross section of the community."  *Berghuis v. Smith*, 559 U.S. 314, 319 (2010).

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). It is also guaranteed by the JSSA, which codifies "the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. There is no requirement, however, that a jury venire or the jury itself mirror the general population or have any particular composition, so long as the selection process is fair. *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001).

    A.    <u>Statutory Challenge</u>

To the extent Watts bases his challenge on the JSSA, it is facially inadequate. First, it is late. A challenge under JSSA must be brought "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, *whichever is earlier*." 28 U.S.C. § 1867(a) (emphasis added). Watts's defense team was in possession of the information on which it bases its challenge when the Court disclosed in early 2016 records and papers used by the clerk in connection with jury selection. Watts had seven days after receiving that material to bring a challenge under the JSSA, but did not bring his statutory challenge within that time period. Additionally, challenges under the JSSA must contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." 28 U.S.C. § 1867(c). No such sworn statement is included in Watts's motion. For these reasons, the Court will deny Watts's motion to the extent it is based on a violation of the JSSA. *See Phillips*, 239 F.3d at 840-42 (rejecting challenge under JSSA for failure to meet timing and supporting affidavit requirements).

B. Constitutional Challenge

To the extent Watts bases his challenge on the Constitution, further analysis is required. To make a *prima facie* of a constitutional fair cross-section violation, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

1. Distinctive Group

Watts has successfully established the first element of the *prima facie* case; African-Americans have long been recognized as a distinctive group in the community for fair jury selection purposes. *See Phillips*, 239 F.3d at 842; *United States v. Ashley*, 54 F.3d 311, 313 (7th Cir. 1995). The second and third elements, however, are not so easy.

2. Underrepresentation

There are several measures for whether the representation of a distinctive group is "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364.[2] Historically, the Seventh Circuit Court of Appeals has used the "absolute disparity" measure, that is, the difference in the percentage of the group in the jury pool and the percentage of the group in the jury-eligible population. *Berghuis*, 559 U.S. at 323. "[A] discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation" of a distinctive group in the venire. *Ashley*, 54 F.3d at 314 (no underrepresentation where absolute disparity is 3%); *see, e.g., Phillips*, 239 F.3d at 842 (no underrepresentation where absolute disparity is less

---

[2] The Court discusses the absolute and comparative disparity measures. A third measure – standard deviation – also exists, *Berghuis*, 559 U.S. at 329, but neither party urges the use of that measure, so the Court declines to discuss it.

than 6.1%); *United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir. 1990) (no underrepresentation where absolute disparity is 8%). In this case, the percentage of self-reported African-Americans qualified from the 2015 Benton Master Jury Wheel is 2.28%, while the percentage of African-Americans in the jury-eligible population in the Benton Division, at least as of 2010, is 5.3%, yielding a discrepancy of 3.02%.[3] This is far less than the threshold of 10% that, absent other evidence, is required to show unfair or unreasonable representation. Thus, the absolute disparity measure fails to show the representation of African-Americans in the jury venire is not fair and reasonable in relation to the number of African-Americans in the community.

An alternative measure is the "comparative disparity" measure, that is, the ratio of the absolute disparity to the distinctive group's representation in the jury-eligible population. *Berghuis*, 559 U.S. at 323. This, of course, tends to yield a higher percentage than the absolute disparity where the group's representation in the jury-eligible population is small. For example, in this case, the comparative disparity for African-Americans is 56.9% (3.02% ÷ 5.3%) where for some other hypothetical minority comprising 20% of the jury-eligible population it would be smaller (3.02% ÷ 20% = 15.1%).[4] The Supreme Court in *Berghuis* recognized that both the absolute and comparative disparity measures can be misleading where the distinctive group composes only a small percentage of the eligible jurors, *id.* at 329, and declined to declare

---

[3] 3.02% is the maximum possible discrepancy, which might actually be smaller because one qualified juror (0.14%) reported multi-racial and nine qualified jurors (1.28%) did not report their race. If any of those jurors were African-American, the percentage of African-Americans in the qualified jury pool could have been up to 3.7% and the absolute disparity with the percentage of the general population could have been as low as 2.5% (as compared to the African-American (5.3%) and multi-racial (0.9%) population, 6.2% – 3.7%) or 1.74% (excluding the multi-racial individual, 5.3% – 2.28% – 1.28%).

[4] Again, if any of those who reported as multi-racial or who declined to report race were African-American, the comparative disparity could be as low as 40.3% (2.5% ÷ 6.2%) or 32.8% (excluding the multi-racial individual, 1.74% ÷ 5.3%).

definitively "the method or methods by which underrepresentation is appropriately measured," *id.* at 330. The Court notes that the Seventh Circuit Court of Appeals has never employed the comparative disparity measure and that cases where the Court of Appeals has found no unfair or unreasonable underrepresentation would have had comparative disparity measures as great as 100% because *no* members of the distinctive group were in the venire, *Phillips*, 239 F.3d at 841 (6.1% ÷ 6.1%), *Ashley*, 54 F.3d at 313 (3% ÷ 3%). To find the comparative disparity measure the only appropriate measure – or even a compelling measure – comes too close to holding that Watts is entitled to African-Americans in his venire rather than simply a jury selected from a fair cross-section of his community, a proposition which has never been adopted and which this Court rejects. *See Taylor*, 419 U.S. at 538 ("[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition. . . .").

In sum, the Court concludes based on the absolute disparity of 3.02% that Watts has not carried his burden of establishing that the representation of African-Americans in the jury pool reflects unfair or unreasonable representation in relation to the number of such persons in the community, the Benton Division.[5] This conclusion is not changed by the comparative disparity of 56.9%, which reflects the presence of a non-negligible presence of African-Americans within the qualified juror pool and which is lower than the comparative disparities accepted (albeit not discussed) by the Seventh Circuit Court of Appeals in *Phillips* and *Ashley*.

---

[5] The Court rejects Watts's suggestion that the appropriate comparison community is the Southern District of Illinois as a whole. Pursuant to the 2011 and 2015 Jury Plans, jurors for his trial will come only from the twenty-seven counties in the Benton Division, so the racial makeup of the whole district is not relevant. Furthermore, it appears Watts calculated an absolute disparity (7%) and comparative disparity (71%) by comparing a sample from the Benton Division to the population of the entire district, which clearly mixes apples and oranges and surely can yield no meaningful statistics.

3.  Systematic Exclusion

More importantly, Watts makes no showing that any underrepresentation was the product of systematic exclusion of African-Americans from the jury pool. Instead, he simply points to consistent percentages of African-American qualified jurors from two consecutive Benton Master Jury Wheels (2.79% absolute disparity and 52.6% comparative disparity in qualified jurors from 2013 Benton Master Jury Wheel) without any evidence of when in the jury selection process any systematic exclusion occurred. To demonstrate systematic exclusion, a defendant must show exclusion "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. For example, in *Duren*, the defendant showed that the underrepresentation of women occurred on a regular basis *and* that the systematic exclusion occurred when the jury selection process allowed women to be exempt from jury service on request or on the mere failure to respond to a summons. *Id.* at 366-67; *see also Taylor*, 419 U.S. at 523, 525 ("conceded systematic impact" resulted where a woman was "not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service").

Here, Watts's jury has been (in the case of the 2015 Benton Master Wheel) or will be (in the case of the venire for his case) randomly selected pursuant to the 2011 and 2015 Jury Plans from sources lists comprised of registered voters and licensed drivers, which the Court has determined represent a fair cross-section of the community. Both plans have been approved by the Judicial Council of the Seventh Circuit. Watts has not pointed to any aspect of these plans that systematically excludes African-Americans or any flaw in the execution of these plans that would systematically exclude African-Americans. While he has pointed to two consecutive qualified juror samples that underrepresent African-Americans, he has not given the Court any reason to

believe that underrepresentation is attributable to anything other than coincidence. *See United States v. Smallwood*, 188 F.3d 905, 915 (7th Cir. 1999) (defendant "has given us no reason to think that the alleged under-representation resulted from anything other than coincidence"); *Ashley*, 54 F.3d at 314 (defendants failed to establish third *Duren* element because "they have not shown that this discrepancy amounts to anything more than a statistical coincidence"). Without pointing to any aspect of or stage in the jury selection process where African-American jurors are systematically excluded, Watts cannot make a *prima facie* showing of a violation of the fair cross-section requirement.[6]

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Watts's motion to strike the petit jury venire based upon systematic discrimination against African-Americans (Doc. 362).[7]

**IT IS SO ORDERED.**
**DATED:   December 8, 2016**

s/ J. Phil Gilbert
**J. Phil Gilbert**
**United States District Judge**

---

[6] Watts also asks the Court to provide AO-12s for the preceding ten years so he can demonstrate a long-standing pattern of underrepresentation. When it ordered that certain jury selection documents be provided to Watts in January 2016, the Court set a deadline of February 12, 2016, for Watts to request additional materials and to specifically explain how each item sought is necessary to his jury selection challenge (Doc. 226). Watts did not make any such request until the pending motion, filed on June 29, 2016. Even if he had made a timely request, the Court would not have ordered disclosure unless Watts could provide some reasonable basis for believing any unfair or unreasonable underrepresentation was the product of some feature of the jury selection process such as, for example, the automatic exclusion of women in *Duren*.

[7] In light of the fact that the actual venire for Watts's jury will not be selected until randomly selected jurors from the 2015 Benton Master Jury Wheel are qualified and sent case-specific juror questionnaires, the Court will allow Watts to request leave to file a motion challenging the composition of that venire promptly after receiving the information necessary for such a challenge so long as that challenge rests on evidence that differs in nature from the statistical evidence offered and rejected in this order.